We'll call our first case. It is 22-20261A, United States v. Gavrilo Wence. Dean Chemerinsky. Good morning. My name is Erwin Chemerinsky. I represent the defendant, Helen Gavrilo Wence. I'd like to reserve three minutes for follow-up. The issue before the court is whether equal protection is violated by a statute that's applied 99% of the time against one race. It was initially adopted for the express basis of history. There are two specific questions. I was going to ask you this. I'm not going to shout at you, but I've been told that the people in this room couldn't hear me yesterday. Oh, I'm sorry. You know, someone like me speaking might be a problem. I'm sorry. I mean, I understand the problem here in relation to the Arlington Heights case. But it seems to me the problem here is somewhat unique because the Constitution itself, and there was some, as you know, the time it was enacted, and after that, the Reconstruction, there was some debate over whether or not the Constitution was a racist document. But we're talking about a document that protects the international slave trade for 20 years, has the three-fifths clause written into it, and also protects the right of slave owners to go into other states, despite the whole thing about states' rights, to bring back future slaves. So that racist history, how do we try to get a handle on the fact that some statutes, which were maybe birthed in that racist document, nevertheless can be applied in a neutral way, even though in the words of the Senate report, in the words of Arlington Heights, it may have a disparate impact on some groups? How can you show that the intent of the subsequent legislature, not the original legislature, is in fact tainted by racism? Your Honor, of course, we can never ignore the racist history of the Constitution, nor can you ignore the racist history of the 1929 statute. What's crucial is that the 1952 statute was a reenactment of the 1929 statute. It wasn't the new statute. But there's substantial modification of the initial document. No, Your Honor, I disagree. If you look at the Senate report, 1515, page 655, it specifically uses the word, I'm quoting, reenactment. And in fact, the changes that were made in 1952 were not substantial. There wasn't anything broadening the statute, making it easier to apply. So, for example, they combined certain definitive provisions. But, Mr. Chemerinsky, I know I'm at a distance and it's very confusing for everyone, but the defendant here was not charged under the 1929 statute. He was charged, in fact, under the present statute, which, if I understand correctly, is a 1996 iteration of the policy against illegal reentry, correct? Yes, Your Honor, except this is the statute, 1326, that was adopted in 1929. The major change was in 1952, but it was then even reenacted. And here, Your Honor, I think there's a Supreme Court principle that's very important. When a statute is reenacted, even with some revisions, it is presumed that Congress is purposefully the same. You have a number of presumptions here, or we have a number of presumptions, Mr. Chemerinsky, and several of them pose burdens for you. The rebuttable presumptions, of course, which is what you're attempting to do, but we begin, of course, with a presumption of constitutionality, right, of a statute. And also, the presumption that the legislators acted in good faith. Now, there may be some interaction between those two presumptions. I've never had a chance to do a deep dive into them, but you begin with that. So, which statute should we focus on here, since the discussion by the District Court was mostly about 1929, 1953, and then we have, as was articulated as recently as two days ago in the Carrillo-Lopez case, a lengthy legislative history, which brings us up to the statute I just referred to, 1996. What's our focus? You must start with the 1929 statute, because everything after that was a reenactment. Your Honor, I want to direct you to the language of the Anderson v. Pacific Coast, 225 U.S. 199. It says, quote, you will not be inferred that Congress, in revising and consolidating laws, intended to change their effect, unless such intention is clearly explained. The court said that in the United States v. Ryder in 1884, Keene v. United States in 1993. You have another hurdle here, too, Mr. Chemerinsky, for appellate purposes, and that's our standard of review. The District Court made a finding of fact here, did it not, with respect to a lack of discriminatory purpose. So in addition to the legal presumptions I referred to, which become burdens to overcome, burdens of proof to overcome, really, you've got an appellate standard of review here that requires us to find that or conclude that the District Court clearly erred. How can we find that on this record? First, Your Honor, with regard to the Ninth Circuit case in Crio Lopez, its error was starting with the 1952 statute and not the 1929 statute. The 1952 law is a reenactment. But I want to discuss the 1952 statute and its own racist history. Second, in terms of the standard of review question, it's quite important that here Mr. Wentz requested a factual hearing of the District Court. The government opposed the factual hearing, saying this is a case that we decided, quote, is a matter of law. You find that in the record on page 317. There are no facts that were found by the District Court other than that based on a legislative record. This court is as good a place to look at the legislative record as the District Court was. Do you think—excuse me, go ahead. In the Senate Committee report, and I'm quoting the report. This is from the Crio opinion. All productive naturalization based solely on the race of the petitioner be eliminated from naturalization laws. That was in the Senate report, I guess, from 1952. The 1947 Senate report, I'm sorry. Wouldn't that be enough to remove the original thing from the supplement legislation? No, Your Honor, not at all. In fact, if you look at the Senate report, I'll give you page numbers, the racist motivation was expressed. As an example, if you look at Senate report 1515, if you look at pages 577, 579, 580, 584, 585, 596, you find expression of racism. If you look at the legislative history, you find Senator Walter George saying that the goal of the statute is to preserve the homogeneity of the American people. If you look at the statements of the sponsor, Senator McCarran, he was expressing racist intent. Your Honor, I think you asked the question in exactly the right way. Did the 1952 statute purge the taint from the 1929 law? That's the crucial question for this court. And then you can look at what the Supreme Court has said in cases like Hunter v. Underwood, the Ramos v. Louisiana, especially footnote 44, and Justice Alito's opinion as to those of his Montana Department of Revenue. All of those cases indicate that the purge of the taint is an acknowledgment of the racist intent, and either an attempt to deal with it or explain why it reaffirmed the statute might have. Congress did none of those things in 1952. But instead, as I said, in page 65 of the court, they said they wanted to continue the 1927 and 1929 statute and make it easier to enforce the 1929 statute. The government relies heavily, as did the Ninth Circuit, on evid for stress. But evid for stress actually supports our position. Because in evid, the Texas legislature in 2013 didn't reenact the 2011 statute but replaced it. And I would direct this court to the language from evid for stress. And here I'm quoting from 138th Supreme Court of 2325. Quote, nor is this a case in which a law originally enacted with a discriminatory intent is later reenacted by a different legislature. This case is, therefore, much more like Hunter v. Underwood, where what happened there was the legislation was reenacted several times with some revisions. And nonetheless, the Supreme Court said the original taint had never been purged, and thus the law was unconstitutional. So you do have a clear discriminatory intent between the 1929 statute, between the fact that in 1952 it was never purged, and that the 1952 statute has its own racist history. What would Congress have to do to purge the racist taint, so to speak, of the original statute? The Supreme Court has indicated that what has to be done is acknowledge the racist taint and either take actions to eliminate it or decide that on balance the statute is still desirable, even if it has the racist taint. What's so crucial about the 1952 report on legislative history is Congress never acknowledged the despicable racist taint of the 1929 statute. Instead, what Congress simply did was say, why don't you reenact the 1929 statute? Is there any rule of law, most importantly, I guess, articulated by the Supreme Court, or is there any canon that we can look to that would support your proposition that the first branch under the Constitution is required to make some kind of acknowledgement? And presumably that would be a majoritarian acknowledgement that there is no recent intent that we have in reenacting this piece of legislation. Yes, Your Honor, there is the general principle that if Congress reenacts a statute, the same motive is reserved for it. But then second, the Supreme Court has indicated that when there is a racist history, that racist history has to be purged. I would direct you especially to the recent opinion of Justice Alito concurring in Espinosa v. Montana Department of Revenue. I direct you to Justice Samara's opinion concurring in Ramos v. Louisiana. In the majority opinion, I direct you to footnote 44, and I'd also direct you to Hunter v. Underwood. I think all of those cases stand for the proposition that when there's a racist history, the taint has to be purged. Wouldn't your argument have more weight, Mr. Chemerinsky, if this were not as I assume that it is? And maybe I should begin by asking you, is this a criminal statute or is it an immigration statute or does that matter? It's both, Your Honor. It's a criminal statute that enforces immigration law. But the Supreme Court in its most recent decision, Department of Homeland Security v. University of California, especially 140 Supreme Court, page 1915, indicated that the Arlington Heights framework is to be used. So wouldn't your argument be more compelling here if what Congress was doing was, in fact, pursuant to an immigration statute, excluding people from crossing the borders into the United States as opposed to criminalizing activity, which is in violation of, in some cases, an order of court, at least an order of an administrative body, often an order of court? Isn't that in and of itself a policy that justifies the passage of legislation of this kind? Your Honor, I almost have an answer. May I answer? Oh, please do. Your Honor, what you have to recognize in this instance is this is a statute that is used 99 percent of the time against one race, Latinx individuals. You're right, of course, that Congress could reenact a statute in a non-racist statute. But here I direct your report to the language of Hunter v. Underwood, which is exactly on point. There the Supreme Court said whether the provisions would be valid today if they're reenacted without any impermissible purpose is irrelevant. So what you have before you is a racist intent and a statute that's applied 99 percent of the time against one race. That's sufficient to meet the burden of Arlington Heights. Your Honor, let me show you. This is one I haven't really reserved time for, but I did, I'll ask everybody.  And this is not really rather a question to our decision here. We've got a ruling given by a standard review and by our court president. The concern I have, let me see how you respond to this. I can't help but think that if we would move for you, Arlington Heights would fall with the current Supreme Court's view of the Constitution and the law. Why should I not have that concern? Which is different from asking you why should I not have that concern if you're in favor of my decision here. I understand. I don't think Arlington Heights would fall. Arlington Heights is from 1977. It articulates an approach that's well established in the law and applies in so many areas. The Supreme Court has used the same approach in the First Amendment context in Mount Helvey v. Doyle. The Supreme Court in the equal protection context essentially applied it under Datsun v. Kentucky. So I can't imagine that the Supreme Court would overrule Arlington Heights. What view is Roe? Roe is 1973, Your Honor. But I think the court felt that it could overrule Roe v. Wade without unraveling a great deal of other law. Justice Alito makes that point explicit in his majority opinion in Dobbs. I think to overrule Arlington Heights would dramatically change the law of equal protection, the law under the First Amendment, and much else. Whether the Supreme Court would affirm this court rules in our favor, obviously we'll see. But I'm not afraid that it would overrule Arlington Heights. Let me ask you to speculate on another matter which is not in the nature really of jurisprudence but more in the nature of politics. Do you have any doubt, Mr. Chemerinsky, that if we were to strike down this statute or if a majority of the courts of appeals were to do so or if eventually the Supreme Court did so, that majorities in both houses of Congress would very quickly reenact the bill? Your Honor, I don't know. It has been so difficult for Congress to adopt any immigration legislation. I agree completely with that. But my point is this, that the reaction would be so resounding here that it wouldn't take long. Again, I think both my question and the previous question of my friend Judge McKee were in the area of asking. It was speculated. Maybe that's unfair. But in any event, immigration causing the kinds of political ripples and sometimes, unfortunately, more than ripples, I think we're looking at something that would have an enormous impact publicly and politically. But Congress, of course, can adopt the statute again. But that doesn't make the current version constitutional. Understood. And I agree with you completely. And also, Your Honor, there are aspects of immigration law that reflect racism. It's a crime to illegally enter the United States. It's not a crime to illegally overstay one's visa. Would Congress acknowledge the racism that's implicit in that statute and adopt a statutory scheme for immigration that's far less racist? At this stage, of course, we're just speculating. But I would of course hope that Congress would do that. Thank you. Thank you. Your Honor. Good morning, Your Honors. Scott Meisler on behalf of the United States. Good evening, House of Tables. This is City U.S. Attorney Adam Sleeper from the District of the Virgin Islands. I'll try to address a number of the points that Mr. Chemerinsky raised with the court. But I obviously did want to get at the beginning that we think that the opinions from the 9th Circuit this week and from the 5th Circuit before that and by state and national law set forth a sound and straightforward path for this court to affirm the district court here, which is that the court can assume without deciding. And I think that the Arlington Act standard applies. And it really has to decide just two questions, I think. There's been a very vague, very strong dissent that's been joined by three or four of the judges there with a very – I find it very forceful in disagreeing with the majority's holdings. So, Judge McKee, there was one – just one judge dissented there, Judge Graves. He relied on a prior dissenting opinion. He had a file in a case involving Mississippi felon disenfranchisement law. But Judge Graves didn't really set forth why his analysis would carry over. And I don't think it would for the reasons I'll try to explain to the court. Well, I agree. The history of the statute there in Mississippi is very, very different. I mean, it's not. This is part of what I suggested to Mr. Chemerinsky at the very beginning, is when you look at the soil that gave birth to the Arlington Constitution and was written by the Arlington Constitution, you do have what many observers at the time described as a racist law. It was a racist document. During the Reconstruction, these debates came out as to whether or not the Constitution was a racist document. Clearly, there were racist provisions within it. And so, it's not so easy to remove. Is it current legislation from that racist birth, racist history? That's a really hard question, Your Honor. Maybe one more for historians or political scientists. Well, the Supreme Court has told us now who's supposed to play the role of historians. Personally, I think that's absurd. But that's what we're supposed to do. Well, I'm not going to trench on a ruined territory of—and let's keep that amendment specific. But I think in this context, I disagree with Mr. Chemerinsky that Abbott's meaningfully distinguishable. I think the Ninth Circuit read Abbott correctly. Abbott gives us—Abbott v. Perez from 2018—gives us, I think, a framework. And it says, whenever someone challenges a law on the basis of a legal protection violation like this, the challenger bears the burden of establishing the intent. And you combine that with the Arwins and Heights language, which the district court applied here and said, Arwins and Heights focuses on the challenged action. I think it's really easy—and this court can decide this question quite narrowly—Mr. Wentz's case. Because Mr. Wentz was charged under the found-in clause at Appendix 44 and in his plea agreement at Appendix 692. The factual basis for his plea was under the found-in clause of Section 1326a. That didn't exist prior to 1952. So not just the penalty scheme, but the actual factual basis and legal grounding of his charge in this case is under the 1952 law. That, along with the principles from Abbott that we think were soundly applied by the Ninth Circuit and the Fifth Circuit, make 1952 the starting point. I should be clear, though, I don't mean to whitewash some of the very troubling and shameful statements made in 1929. We acknowledge in our brief— What about some of the language that your colleagues cited to us with respect to the legislative history of 1952, while coupled with the very disparate impact it has on folks that are Latinx? Right. I think— I think—I would refer the court to the Ninth Circuit's opinion. I think the Ninth Circuit meticulously walked through the 1950 report and explained why—what the Senate was doing there. Some of the parts that were quoted were about the national origin quotas. Some of the quotations that we put down in our brief were taken out of context because they were basically— they were competing views on retaining or dismantling the national origin quotas. The nativists did make quite forceful and troubling statements about why this should be changed or extended to Mexicans or Central Americans. But what's critical, again, is that that was just one point of view. There was a competing point of view set forth, and, importantly, the nativist views got prevailed. At that time, the Western Hemisphere quotas, the national origin ones, were not extended to Western Hemisphere countries like Mexico and other Central American countries. So some of the worst impulses that you saw described there were not enacted into the national origin quotas. I think, critically, the Ninth Circuit helpfully pointed out that a lot of those— that it's unfair, in some sense, to attribute statements made in one part onto this legislation. Mr. Meisler, if I could jump in here and try to go back to a question that I raised earlier with Ms. Chemerinsky. And it deals with the more attenuated or lengthy legislative history that I see as existing with 1326. Really, as compared to what was discussed in the decision that is under review here, which really just juxtaposed the 29 statute against the 52 statute. Should these later amendments or reenactments, however we want to characterize them, affect our analysis here? Certainly they did with the Ninth Circuit decision. But is it really quite as narrow a legislative history as was discussed and well discussed in the case that we're reviewing, whether or not it carries the day? So I think, Your Honor, I agree with the way that the Ninth Circuit and the Fifth Circuit analyzed that. They basically said that when we have all these other intervening legislative enactments, none of which have been demonstrated or meaningfully alleged to themselves to be tainted by racism, then I think the way the Fifth Circuit phrased it was you're farther away from the odious origins of the law. And the Ninth Circuit, I think, quoted that with approval of the footnote. That's one way they're important. And if this court were to reach the second step of Arwin's Heights, which I don't think it has to, to ask whether the statute would have been enacted in the absence of racial animus, basically kind of a counterfactual scenario, then I think, again, in judgment, the fact that the statute was repeatedly changed and altered to adjust its deterrent effects absent any indication of racism is a strong indication that it would have been enacted in the first instance. You've leaned heavily, have you not, or did you not, in your brief on Congress plenary authority in the immigration area? We did, Your Honor. That's kind of a separate argument that you shouldn't even be doing in our Arwin's Heights analysis. I understand, but we haven't touched that yet. And if I understand your position correctly, you did that because you don't believe that Arlington Heights is applicable here. Is that correct? That's correct. But I also should emphasize that we're trying to give the court kind of a narrow path to affirmation because the district court didn't agree with us on that. I'm happy to address any questions. Look, I understand wanting to dance with the one who brought you. That is often effective advocacy. But in any event, I'm leading up simply to the question because I am curious as to the government's position as to just what the breadth of this plenary authority is. I think that the Supreme Court hasn't fully defined it, I think, as the Ninth Circuit has said in Correa-Lopez. But the court has given both the executive branch and Congress significant leeway in questions of the immigration law, of naturalization. Correa-Lopez didn't even mention it. They raised the issue, but they didn't decide it. They avoided it.  Correct. Correct. I mean, so if the court were to go down that road, we think that you could do what the Supreme Court did in Trump v. Hawaii, recognizing congressional and executive authority in the area, but also leaving open at the court in Trump v. Hawaii a case for bare animus. It's important to remember that at the end of that opinion, the court said, even under rational basis review, laws that are designed purely to harm an unpopular minority themselves can be irrational. And it pointed to decisions from the gay rights setting, liberal v. Evans, and also from gender discrimination cases like the Department of Education against Moreno. So if the court reaches that, I don't think the district court's concern here about totally shielding Congress from racist laws would apply under that standard of review. But, again, we don't think the court has to reach that. The thing I'm suggesting is that earlier, in response to the question that Judge McKee answered, it sounded like you were going down the road, but I don't think you were, that the mere passage of time would not be sufficient to dissipate the area. Do you not agree with that? So I think it's a much harder question, Judge McKee, in a case like Hunter v. Underwood mentioned by Mr. Chemerinsky, where there's been no legislation, no congressional revisiting of the issue. That is where I want to make it clear for the court. Mr. Chemerinsky kind of grouped Hunter with Abbott and other cases. Hunter, and this is quite clear from the case there, the language in the case, Hunter was a situation where only the state courts had tweeted the statute by striking down some of its more blatant and discriminatory provisions. Legislature had never revisited the felon disenfranchisement law of Hunter. It's quite clear from Hunter itself. It's clear from Abbott, the way he describes Hunter. And I think Judge Cooper's decision for the Military of Pennsylvania in the Gonzalez-Nanier case is cited in our brief next at this point as well. So Hunter is a situation where no legislative revisiting, but when you have Congress returning to a statute and making substantive changes to it, like adding the founding clause, like adding an exception to liability, that's in 1326a2, those are meaningful changes. That takes us out of the reenactment canon that Mr. Chemerinsky mentioned. That's a canon he cited in a case like Keene Corporation from 1993. Are those changes sufficient to purge the taint, so to speak? So I don't think it's a purge the taint analogy. It's sufficient to put us, put the focus in 1952. And once you say, what is the flaw we're looking at? We're looking at the Immigration and Nationality Act as enacted in the 1952 Congress. Then that Congress gets the presumption of good faith, and the defendant, the challenger of the law, has to come forward with evidence in that Congress. So we never circle back to the 1929? You only look at that. This is the language from Abbott. You only look at that evidence to the extent that it sheds light on the intent of the 1952 legislature. That's what Abbott said. What if there's not an express disavowal of the South Carolina legislature by the previous legislature? Doesn't that give some sort of potential evidence of intent? It does not, Your Honor, for among other reasons. The legislature that's operating much later in time, many decades later, when 95% of its members have left, cannot be charged with, I think, the knowledge. I'm going to go back to the floor statements that were made in 1928, 29, or looking at committee reports from 1925. They don't know. They may not know the history of the law. And it would be an ideal world we want legislators to do their homework. But I'm not sure it's fair to require that. They don't know the history, and they reenact the previous law. Arguably, that supports Mr. Shumrisky's argument that the change of the previous law should give a rebirth in South Carolina law. And the reason that's given rebirth is not necessarily because of any of the level of intent. It's based upon ignorance of the motivation of the prior law. So I'm not sure that helps. Well, I think it does where you're talking about substantive revisiting of the law. We're not talking again about what he's calling a reenactment, which I take to be just, you know, you moved it from Title VIII to Title XVIII. You added a comma. You carried it forward. The language he's quoting, Robert—this is critical. The Ninth Circuit reviewed this at length. It's a report that predates the legislation by two years. And the Ninth Circuit described in painstaking detail all that happened between 1950 and 1952, changed this law, and made all these changes. Not carrying forward, but substantive revisions to the policy and the nature of the offense. And I think that's critical. So just to focus in on those changes, including, I should say, some of the very pieces of evidence. Mr. Shumrisky relies on in this brief things like the letter to Congress by Deputy Attorney General Ford that happened after the report, after the legislation was changed and modified. And is that the only place where the attorney went back and appears is in Ford's letter? No. I think I'm going to guess that some of the citations that Mr. Shumrisky rattled off to you were also mentions of the road map. But as we put it in the footnote in our brief, I think that deterrent has come to have unquestionably offensive meaning, and I'm not going to stand here and tell you otherwise. But I also think we should be careful not to judge predecessors too harshly. That word was used repeatedly in judicial opinions, including Judge John R. Brown's opinion. Yeah, but so was with the N-word. I mean, the fact that it's common parlance does not necessarily – you can't say, well, but back then it was kind of generally accepted. And therefore, using that in a subsequent way, it's all right because the animus was removed. But I'm not sure that's a very good argument. Well, I just – I think the idea – the question is what the context and the totality of circumstances which are what Arthur Knight says, Your Honor. And I think the Knight Circuit auditors have soundly concluded that alone, even if you view that as an embarrassment or as unfortunate as in Judge Coddard's 1998 case, that alone I think is not enough to invalidate the law. What would be then? If using the term road map is not – what would be enough to invalidate the law? Well, I think you would need stronger evidence that really the majority of Congress, right, the Supreme Court in Brnovich, the Brnovich case, said you're looking at the intent of the legislature as a whole. You can't just, I think, take stray remarks from certain Congressmen. So the fact that certain members of Congress expressed animus on the floor shouldn't be enough. And that's important, right, for the principle the Supreme Court set back as far as United States versus O'Brien in 1967. And we usually are not kind of nitpicking what legislators say on the floor. We do that sometimes with legislative history, and we have to be careful about that. But the costs are very high if putting too much weight on what one person says that we don't know oftentimes why the majority of members vote. So I think we need very strong evidence. We are, Your Honor, talking about what would be the first time ever, to my knowledge, that a federal court holds that Congress – not states, but Congress – acted with discriminatory animus. That's never been found before, to my knowledge. We're not saying that never happened. I'm not saying that, but I'm saying that it had never been found. So I think we should – taking that into account, taking into account the perception of legislative good faith, the perception of constitutionality that Judge Smith mentioned. And before my time runs out, I do want to just mention on clear error review. We are hearing clear error review. Mr. Chemerinsky and I had the pleasure of arguing this issue in the Ninth Circuit in December. I was asked about clear error review. How can we reverse clear error review? And he relied on it. I had to distinguish it. I had to deal with it. And we embraced that standard because it is the one – whether as a regional matter, a court would look at this and say this feels more like a legislative fact issue as opposed to a fighting historical fact review deferentially. The Supreme Court repeatedly, Brnovich, Abbott, Hunter v. Underwood itself. In that case, the Eleventh Circuit had reversed the district court. The district court found no animus. The Eleventh Circuit said the record clearly supports animus on clear error review. And the Supreme Court affirmed that determination. So I think we are hearing clear error review. If you reach the discriminatory intent, probably one for Arlington Heights, I think that does constrain the court. And we think that the district court below, aligning with multiple appellate courts and almost all the district courts in the country, could not agree with clear error because the record fully supports that finding. Mr. Mizer, what should we make for purposes of attempting to divine the motivation of Congress in the early 50s as opposed to 1929 from the silence that has been referred to? The choice or the apparent or what may simply be an assumption on the part of Congress that it needs say nothing. What weight, if any, should a finder of fact give to that? I don't recall that it was referred to at all by Judge Malloy in his opinion, but should it have any role whatsoever? It should not, Your Honor. I think that he may not have mentioned it because the Correa-Lopez District Court, to my recollection, was the first one and the only one to give it weight. And he didn't have a decision before him at the time he issued his opinion. So he did not mention it. I think it should get no weight. I think the Fifth Circuit properly handled that. It basically said it puts the burden on the wrong party, right? We're starting here with a presumption of good faith. Let's say the good faith silence means we're reading something. So the party – so what you're saying is the party with the burden can't make something from a nullity? Is that essentially what your argument is? It is, and I think giving – reading negative connotations into silence is kind of the – is another way of getting at the express disavowal requirement that Mr. Chemerinsky is advocating. I think for the reasons the Ninth Circuit gave, we don't think that that has any support in law. And it is notable that he's relying not on the majority opinions in most of the Supreme Court cases but on concurrences. The one, I think – one majority opinion I think he cited was footnote 44 of Ramos v. Louisiana, which struck down Louisiana's not-unanimous jury requirement. And I can just – I'll just try to conclude briefly here. But it's really important for the court to look at the context of that footnote in that discussion. The Supreme Court was deciding whether to overrule a prior case called Apodaca that had taken what it called a cost-benefit or functional approach. And the court said we can't – you can't do a functional approach. You can't look at the costs and benefits of something unless you are looking at the racist – considering the racist purposes that that rule was designed to serve. So history was especially important there because of the context. I don't think the court was saying there's something kind of forever tainted principle. And it didn't, again, mention this purge of the taint problem, which would have been very strange considering Apodaca had just been decided. So I don't think Ramos overrules or cuts back on Apodaca in any way. If there are no further questions, we would ask that the judgment be affirmed. Judge Smith, anything else? No, thank you very much. Thank you, sir. Thank you, Judge. Can you just hold on one second? We have to adjust the mic. Thanks. Thank you. First, the Arlington Act standard applies. In response to Judge Smith's question, the district court was correct here. The most recent Supreme Court case about this, Department of Homeland Security v. Regents, 140 Supreme Court, 1915 to 1916, used it. And if you read the government's reply brief in this case, it says, no matter how expressed the racism in immigration, only rational basis is here. And they just can't be right. Second, the 1929 statute must be the starting point. The Ninth Circuit and the Fifth Circuit erred by not starting with the 1929 statute. The 1952 statute said explicitly it was a reenactment of the 1929 statute. Again, if you look at the report on page 655, it used the word reenactment. The government says that there were substantive revisions in 1952. Actually, it was carried forward verbatim, and all that was done was expanding the scope. In 1929, they had a crime to illegally enter, and then they added founded, so the government wouldn't have to prove where a person entered. But what Congress did in 1952 was double down on what it had done in 1929. Nothing changed it. Third, with regard to the 1952 statute, the question is, did Congress in any way purge the taint from the 1929 statute? Here, I think it's important to focus on what the government just said to you. They said the burden is to show that a majority of the legislators expressed racism, but that the legislature as a whole had that motive. Now, that can't be the standard, because then Arlington Heights will never be mapped. We could never have an instance where a majority of the legislature expressed racism. In fact, in Arlington Heights, it says you don't have to prove it is the motive, just that a motive was racism, and we certainly meant that. With regard to the 1952 legislative history, the government said ignore all of the racist statements, because they weren't from a majority. They were a minority view. Those racist statements show that Congress wasn't purging the taint, that Congress instead was, as I said, doubling down. If you look at Abbott, what you see is there the Supreme Court said that the Texas legislature in 1913 repealed the 2013, repealed the 2011 statute, didn't carry it forward, whereas in 1952, Congress reenacted, and all of the subsequent statutes Judge Smith referred to were reenactments, and none of them purged the taint. Finally, in terms of clearer, I would certainly argue that here there was clearer by the district court. But I think it's important that when it's requested a factual hearing here, the government said a factual hearing is unnecessary. Resolve this as a matter of law. If you resolve it as a matter of law, we meet the Arlington Heights standard. But if you believe a factual hearing is appropriate, then the case should be remanded. Your Honors, this is a federal statute that's used 99% of the time against one race. It's a statute that originally had an express racist history, a racist history where the taint had never been purged. For these reasons, the district court reversed, and this is a statute that should go to unconstitutional court. My question is, what would a factual hearing look like? Who would be called to testify? We could have a factual hearing in terms of what did Congress intend in 1952, and you could call expert witnesses with regard to it. But your question, Your Honor, indicates why this isn't a traditional question of matter. This is really a question of law. Is Arlington Heights matter? It's not a situation where you have witnesses coming to testify, where there's deference to the district court, and clear standards apply. This court is in good place as the district court to decide, is the Arlington Heights standard matter? Is the discriminatory intent discriminatory? Judge Feinberg? No, nothing further. Thank you. It's not a question. It's a comment. I'll take it literally because I'm not the presiding judge. My new friend and colleague is. But it's rare that we see oral advocacy of this kind around both sides. It is absolutely delightful to see it. I wish we would see it more often, but we just don't. I don't know. Maybe the experience of my colleagues here is different, but I commend both attorneys. I know you've kind of taken this on the road, and it's not your first road. It was at work. But, nevertheless, the level of advocacy and the extent to which you listen to our questions, answer the questions, answer them truthfully, is really absolutely delightful and wonderful, and I thank you both for your advocacy. Thank you. It's such a pleasure to argue before you. Thank you. I absolutely concur. And I will ask the transcript of this argument to be prepared and that the government look through it. Thank you very much, counsel, for your arguments and your submissions.